George W. ESCHELBACH, Plaintiff-Appellant,

v.

WILLIAM S. SCULL CO., Inc., Defendant-Appellee.

No. 13575.

United States Court of Appeals Third Circuit.

Argued June 20, 1961.

Decided Aug. 1, 1961.

Rehearing Denied Sept. 5, 1961.

Charles S. Schermer, Philadelphia, Pa. (Donald R. Taggart, Philadelphia, Pa., on the brief), for appellant.

Peter J. Devine, Jr., Camden, N. J. (Michael Patrick King, Kisselman, Devine, Deighan & Montano, Camden, N. J., on the brief), for defendant-appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This personal injury action arises out of a collision of two automobiles. It resulted in a jury verdict for the defendant.

Plaintiff driver argues three points for reversal. First, he contends that the trial court seriously erred in allowing the defense to probe the extent of his drinking alcoholic beverage during the relevant period.

The accident occurred Saturday night, November 9, 1957, about 9:30. Plaintiff had been down at Ocean View on the south New Jersey shore "for a change, for recreation" since the previous day. He left there around 7:30 to 7:45 P.M. for his home in Langhorne, Pennsylvania. He was headed approximately north on Weymouth Road toward the Black Horse Pike. The location of the accident was about two miles beyond Mays Landing which in turn was 25 to 30 miles from Ocean View. According to the plaintiff, in the collision area, the road was about 40 feet wide, straight away, with a little crown on it. The black top of the road was around 20 feet wide with 12 feet pavement or gravel shoulders on each side of it. It was a clear and dry night. He said his passenger automobile was traveling about 30 miles an hour; that he saw the defendant's truck coming towards him at a speed of 50 miles an hour on its own side of the road; when it was 10 to 12 feet away from him it made a left turn directly into his machine which was then about a foot or two off the black part of the road and on the gravel on his right side of the road; that the right fender of the truck struck his left front; that he had stopped his car

prior to the collision and that it was not in motion at that time.

John Michel, the driver for the defendant said that he was operating the truck in a southerly direction on Weymouth Road, that he saw the plaintiff's headlights about two city blocks ahead of him and they seemed to be on the truck's side of the road; that he went over to his right as far as he could, blinked his lights and blew his horn "but he kept coming at me." He had slowed down to practically a stop. When plaintiff's car was 20 feet or so in front of him, Michel "knew he was going to hit me" so he " * * * swerved to the left and tried to get out of the way * * *." The other car itself swerved and hit the truck "before I got over there." Michel stated that Eschelbach " * * * to me he looked like he had been drinking." Harry Rambo was a passenger in the truck. He said that "it looked like the lights were making a left turn off the highway and then they came towards us." And he generally corroborated Michel's evidence.

New Jersey State Trooper Olsen was at the scene of the collision shortly after the event. He talked with plaintiff then and a little later at the hospital. He testified that "I had asked him (plaintiff) if he was drinking and he said he had but he did not know how much." The trooper " * * * found from the skid marks that the number one vehicle (truck) was swerving towards the left side of the road to avoid a head-on collision which, at the last minute, the number two vehicle (plaintiff's) swerved towards the right side and they met head-on, now there was no reason to disbelieve Mr. Michel's statement and additionally at the scene we had the skid marks."

On cross-examination, plaintiff was shown an interrogatory addressed to him reading, "What speed was your vehicle traveling immediately prior to the accident?" His answer to it was "Approximately 45 miles per hour." He denied he had said that. He was shown another interrogatory of a separate set which asked him to "State the respective speeds of the vehicles at the time of the impact." Plaintiff's answer to that was "Plaintiff approximately 40 to 45 miles an hour and defendant's speed unknown." He said he did not recall this. He was asked " * * * which is the correct version, what you gave us under oath in September, 1959 (the above answers to interrogatories) or what you are giving us under oath today * * *?" He answered "Today's". He said he understood the speed limit on Weymouth Road to be 50 miles an hour.[1]

At Mays Landing, plaintiff stopped at what he described as "A restaurant. I don't know if you would call it a taproom or what." He did not have any food there. He said that he was in the place an hour or an hour and a half, something like that and that he had "two beers" during that time.

He was asked, "Did those beers have any effect on you at all?" The answer was "No". He was next referred to his pretrial deposition and asked "Did you on that occasion tell me that you drank 30 beers over an afternoon?" The question was objected to, allowed as proper cross-examination and the answer was "Yes". Then came the following questions and answers:

"Q. And did you have your 30 beers on the afternoon before the happening of this accident? A. No. I am talking about the time that I was home.

"Q. Well, your answer is that you did not have these 30 beers? A. That is right.

"Q. That is, on the afternoon preceding the happening of this accident? A. That is right.

1. Cross-examination developed impressive gaps in plaintiff's injury testimony in connection with a serious accident and injury to his left hip prior to the accident be-fore us and a subsequent fracture of his left leg which was also hurt in the collision involved here.

"Q. You say you restricted yourself to two beers at Kelly's? A. Yes, sir.

"Q. And that was during the period of about an hour and a half? A. Yes.

"Q. All right, and to your recollection, you say, that those two beers had no effect on you whatsoever? A. That is right.

"Q. On the occasion when you consumed 30 glasses of beer, did they have any effect on you, Mr. Eschelbach? A. No."

After it had been answered, the last above question was objected to as "irrelevant, immaterial and incompetent".

On *redirect* examination there was the following sequence of questions and answers:

"Q. Mr. Eschelbach, you were questioned about your stay at Kelly's Taproom. A. Yes.

"Q. Which, I believe, is in Mays Landing. A. Yes.

"Q. Now, how many beers did you actually have there? A. Two, as far as I remember.

"Q. And when you say 'Two,' do you mean glasses? A. Well, two glasses.

"Q. Not bottles? A. No.

"Q. Had you anything else to drink at Kelly's? A. No, sir.

"Q. Was that why you stopped at Kelly's, to have a drink? A. Well, I went into the men's room.

"Q. Did you have any food there? A. No, I don't remember eating that night.

"Q. Were you under the influence of that drink when you were operating your automobile? After leaving Kelly's Tavern? A. No, no, sir."

Appellant's argument on his first point is based upon a misinterpretation of the main theory behind the particular defense cross-examination. The latter was not to prove that plaintiff was intoxicated on previous occasions or addicted to the use of intoxicating liquors and endeavoring to infer therefrom that he was intoxicated at the time of the accident.[2] It was to directly strike at the center of plaintiff's claim—his credibility.

His story was that after proceeding not more than 25 or 30 miles after leaving Ocean View, he stopped at what his attorney characterized as a "tap room". His attempted explanation for so doing appears in the above quoted question by his attorney and his answer thereto:

"Was that why you stopped at Kelly's to have a drink? A. Well, I went into the men's room."

In the circumstances his prior admission that in the course of an afternoon at home he customarily drank thirty glasses of beer which according to him did not affect him any more than did his consumption of two, did help give the jury some assistance, together with all his other testimony and all the other evidence in the trial, to, (as was said by the judge in his charge):

"* * * determine the facts from what you concede (conceive?) is the believable testimony taking into consideration the probabilities and the attitudes of the various witnesses. * * *

"In weighing the evidence, you have the right to examine into the credibility of the various witnesses, and in so doing, you may take into consideration their demeanor on the witness stand, their interest in the outcome of the case, the vagaries of the human mind in its attempts to recall past matters, the opportunities of witnesses to see and hear what may have taken place, and the likelihood of their making particular note, or recalling particular details. You may then accept the credible, and reject the incredible."

We agree that the net result of plaintiff's referred to testimony was harmful

2. See Shelly v. Brunswick Traction Co., E. & A.1901, 65 N.J.L. 639, 48 A. 562.

to his cause; on redirect most of all. However, that harm had its true source in the impression conveyed by plaintiff to the jury as to whether he was telling the truth in the narrated instances. The jury conclusion on that undoubtedly affected its view concerning plaintiff's version of how the accident happened. The court's refusal to emasculate the cross-examination of this thoroughly justified probe of plaintiff's credibility was a sound ruling and is upheld.

■ The second proposition urged for appellant as captioned in his brief is that "The Learned Trial Judge Committed Fatal Error in Admitting into Evidence the Traffic Summons, *Which Plaintiff Signed and Mailed into the Magistrate's Office with the Fine.*" (Emphasis supplied.)

The summons was for statutory "careless driving", the specification of which was "indifferent driving". It fixed a date of hearing on the charge before the Magistrate at Mays Landing. It warned that the plaintiff's driver's license would be revoked for failure to appear as directed.

In accordance with the requirement of *Local Criminal Court Form 12, New Jersey Court Rules of September 9, 1953*, in effect at the time, the summons contained the following:

"Appearance, Plea and Waiver

"I, the undersigned, do hereby enter my appearance on the complaint for the offense charged on the other side of this summons. I have been informed of my right of a trial, that my signature to this plea of guilty will have the same force and effect as a judgment of court, and that this record will be sent to the Director of the Division of Motor Vehicles of New Jersey (or of the State where I received my license to drive). I do hereby PLEAD GUILTY to said offense as charged, WAIVE my right to a HEARING by the court, and agree to pay the penalty prescribed for my offense.

· · · · · · · · · · · · · · · · · · · · · · · · · · · · ·
(Defendant's Name)
· · · · · · · · · · · · · · · · · · · · · · · · · · · · ·
(Address)
· · · · · · · · · · · · · · · · · · · · · · · · · · · · ·
(Driver's License No.)"

The record shows the following cross-examination of plaintiff concerning the above referred to summons for "careless driving" given him by the State Trooper:

"Q. Mr. Eschelbach, I show you Municipal Court summons which has been marked Exhibit D–3 for identification, and I show you the reverse side on which there appears the language 'I, the undersigned——'

"The Court: No, no. I don't think it is necessary to read that.

"Mr. Devine: All right, sir.

"Q. I show you the reverse side, and I point out to you, Mr. Eschelbach, that there appears on the reverse side the signature George W. Eschelbach. That is your name, isn't it? A. Yes.

"Q. And underneath that there appears '117 Trevose Avenue Rt.-3, Langhorne, Pa.' That was your address? A. That is right.

"Q. And immediately under that there appears a driver's license number 1939922. Do you recall that was your license number in 1957? A. Oh, I could not remember that.

"Q. Very good. Now, Mr. Eschelbach, I want you to look at that signature, and I want you to look at the signature which appears on your answers to interrogatories dated September 19, 1959, and I ask you to look at your signature appearing on the surgeons' permission slip bearing date November 11, 1957, and tell me is it not a fact that the signature appearing on the summons is your signature? A. It looks like it, yes."

The summons was admitted into evidence for the purpose of throwing light on the question whether plaintiff by his own action pleaded guilty to a charge of careless driving surrounding the circumstances of this accident and to test his credibility on that point. The court left to the jury the decision whether with reference to plaintiff's action if any in connection with the traffic ticket it was indicated that he had violated a rule of the road or of the Traffic Act. Continuing the court correctly charged the jury in accordance with New Jersey law that if it found " * * * that the plaintiff or the defendant violated a rule of the road or of the Traffic Act that standing alone, and of itself, does not necessarily mean that he is guilty of negligence or contributory negligence. However, it may be a circumstance to be taken into consideration by you in determining whether or not under all of the circumstances as developed by the entire evidence, the plaintiff or the defendant at the time and place in question exercised the reasonable care that they were required by the law to exercise." Jones v. Lahn, 1949, 1 N.J. 358, 361–362, 63 A.2d 804; Kolankiewiz v. Burke, E. & A. 1918, 91 N.J.L. 567, 103 A. 249; Belperche v. Erie R. Co., E. & A. 1933, 111 N.J.L. 81, 166 A. 463.

Plaintiff, as seen, did not categorically admit at the trial he had signed the traffic summons. However, there is the clear admission of the fact together with that of his mailing it with the required fine to the Magistrate's office contained in the quoted brief caption.

The objection stated in the brief is centered on the assertion that the summons is "not at all clear or definite as to what plaintiff is alleged to have pleaded guilty, nor does it show under what facts a conviction or plea of guilty was taken." No complaint is made against the statute itself, N.J.S.A. 39:4–97, which reads:

"A person who drives a vehicle on a highway carelessly, or without due * * * circumspection, in a manner as to endanger, or be likely to endanger, a person or property, shall be guilty of careless driving."

The exact term "careless driving" named and defined in the law is the offense set out in the summons. In addition, as called for by the statutory form of summons, the kind of "careless driving" is specified i. e. "inattentive driving". State v. Joas, 1961, 34 N.J. 179, 168 A.2d 27, 31. By the named offense and the specification under it, it was charged that appellant while operating his automobile at the time and place of the accident did not give the attention to his driving which was necessary under the circumstances so as not to endanger persons or property. The plea of guilty by appellant to the traffic offense of careless driving was properly received into evidence in this civil action which arose out of the same facts and circumstances. Liberatori v. Yellow Cab Co. of Philadelphia, App.Div.1955, 35 N.J.Super. 470, 114 A.2d 469; Mead v. Wiley Methodist Episcopal Church, App.Div.1952, 23 N.J. Super. 342, 93 A.2d 9, 14.

The fundamental situation facing plaintiff under which the plea of guilty was entered is manifest on the face of the summons itself. Appellant, whether because he did not wish to have a trial and personally appear or had no defense or whatever his reason, entered his written appearance to the charge and his signed plea of guilty to it on the summons and mailed it with the prescribed fine to the designated Magistrate. There is no claim that such act was other than entirely voluntary on the part of the plaintiff. There is no merit to the argument now made with respect to the reception of the summons into evidence.

■ The remaining point contends the trial judge erred in charging the following:

"If you find that plaintiff signed the summons issued to him by the State Trooper, you may consider such to be a plea of guilty to the charge, and an admission against interest. You may consider such an admission as evidence supporting

the charge the plaintiff's negligence was either the sole cause of the accident, or a contributing cause barring his recovery."

This was not objected to at the appropriate time. It is not validly before us. Fed.R.Civ.P. 51, 28 U.S.C.A. It does not embrace the substantial error that would bring it within our scope of review.

We note in passing that we have already generally covered the area of the objection. The summons was rightfully allowed into evidence. Whether plaintiff signed it was left to the jury and in the event the latter found he had, as the court said in effect immediately above and at length in the portion of the charge we quoted earlier and now repeat, violated a " * * * rule of the road or of the Traffic Act that standing alone, and of itself, does not necessarily mean that he is guilty of negligence or contributory negligence. However, it may be a circumstance to be taken into consideration by you in determining whether or not under all of the circumstances as developed by the entire evidence, the plaintiff or the defendant at the time and place in question exercised the reasonable care that they were required by the law to exercise."

The judgment of the district court will be affirmed.

KALODNER, Circuit Judge (dissenting).

I agree with the majority's view that "the net result of plaintiff's referred to testimony [relating to his drinking habits] was harmful to his cause". I disagree, however, with the majority's view that the extensive examination of plaintiff with respect to his rather extraordinary drinking habits which portrayed him as a "heavy" drinker was not such prejudicial error as to require a new trial.

It is settled in New Jersey that, while evidence of a car operator's intoxication at the time of the accident is admissible as "proper evidence of negligence",[1] evidence as to his being a heavy drinker, or of his prior intoxication, is irrelevant and must be excluded. Shelly v. Brunswick Traction Co., Ct.Err. & App.1901, 65 N.J.L. 639, 48 A. 562, 563. It was there said:

"To prove that the plaintiff was intoxicated on previous occasions, or, * * * was addicted to the use of intoxicating liquors, would not prove that he was intoxicated at the time of the accident, and to show that on previous occasions of intoxication he was in a helpless condition would not tend to show that on the occasion in question he was intoxicated to such a degree as to be helpless."

In the instant case there was not an iota of evidence that the plaintiff was intoxicated at the time of the happening of the accident and the trial judge committed reversible prejudicial error when he permitted introduction of evidence as to the plaintiff's drinking habits.

I vigorously disagree with the majority's view that the evidence of prior drinking was admissible because it bore on the question as to plaintiff's "credibility" with respect to his testimony as to how the accident happened.

The general rule is *contra* to the majority's view and while research has failed to disclose its specific application in New Jersey, I believe that the courts of that state would subscribe to it.

The general rule was stated as follows in McQuage v. City of New York, 1954, 285 App.Div. 249, 253, 136 N.Y.S. 2d 111, 116:

" * * * The obvious purpose of the testimony was not to impeach the credibility of the plaintiff but to show that he had been intoxicated on other occasions and thus permit the jury to draw the inference that he was intoxicated at the time of the happening of the accident. Proof of intoxication on occasions prior to the

---

1. Roether v. Pearson, App.Div.1955, 36 N.J.Super. 465, 116 A.2d 529, 531.

accident was not admissible to prove or suggest that plaintiff was intoxicated at the time of the accident. The authorities relied upon by the defendant relate to proof of intoxication at the time of the event. It has been said upon the general subject of testimonial impeachment that 'a general habit of intemperance tells us nothing of the witness' testimonial incapacity except as it indicates actual intoxication at the time of the event observed or the time of testifying; *and hence, since in its bearing upon moral character it does not involve the veracity-trait * * it will ususally not be admissible.*' (3 Wigmore on Evidence (3rd ed.) § 933, p. 481)." (Emphasis supplied.)

Since the majority concedes that the mooted evidence was prejudicial to the plaintiff, and as I view it, its admission was clear error, the judgment below should be reversed and the cause remanded with instructions to grant a new trial.